UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

U.S. ALLIANCE GROUP, INC.                    CIVIL ACTION

VERSUS                                       NO. 21-1074

CARDTRONICS USA, INC.                        SECTION "R" (2)

## ORDER AND REASONS

Before the Court is defendant, Cardtronics USA, Inc.'s ("Cardtronics") motion to dismiss under Federal Rule of Civil Procedure 12(b)(6).[1] Cardtronics also moves in the alternative under Rule 12(e) for a more definite statement.[2]  Plaintiff, U.S. Alliance Group, Inc. ("USAG") opposes the motion.[3]  For the following reasons, the Court grants in part and denies in part defendant's motion to dismiss.  The Court also denies defendant's motion for a more definite statement.

## I.    BACKGROUND

This dispute arises out of an agreement in which defendant Cardtronics agreed to provide certain services to plaintiff USAG's customers.

---

[1]    R. Doc. 15.
[2]    *Id.* at 2.
[3]    R. Doc. 16.

On September 30, 2008, USAG, a California corporation,[4] entered into an "Agreement for Processing Services" (the "Agreement")[5] with defendant Cardtronics's predecessor-in-interest, Columbus Data Services, LLC ("CDS"), a Louisiana LLC.[6] Cardtronics is a Delaware corporation, registered to do business in Louisiana, with its principal place of business in Texas.[7] USAG provides "electronic payment processing solutions to merchants," such as providing physical ATMs and services related to facilitating the processing of ATM transactions.[8] Under the Agreement, USAG would refer merchants to Cardtronics for ATM processing services.[9] The combination of USAG's and Cardtronics's services allowed the parties to provide for "an ATM machine to dispense cash, retrieve the funds from the cardholder's bank, pay the ATM owner [merchant] a percentage of the fees, and thereby complete a full [ATM] transaction."[10]

More specifically, Cardtronics would provide the merchants with "frontend processing services," which included the software necessary to

---

[4]    R. Doc. 1 ¶ 1.
[5]    *Id.* ¶ 6.
[6]    R. Doc. 15-1 at 2 & n.2.
[7]    R. Doc. 1 ¶ 2.
[8]    R. Doc. 16 at 2.
[9]    R. Doc. 1 ¶ 6.
[10]    R. Doc. 16 at 2.

settle an end customer's ATM transaction.[11]   USAG would provide the merchant with the "backend processing services," by processing transactions between the ATM machine and the bank, and then providing the merchant/ATM owner a statement reflecting the transaction.[12]   The Agreement in practice functioned by having USAG refer a merchant ATM location to Cardtronics, at which point Cardtronics would "assign the respective 'TID' or 'Keys' for that location or ATM to USAG."[13]   These keys enabled Cardtronics to process the frontend transactions between the ATM machine and the cardholder.[14]   USAG would then take the keys and program them into the ATM, which would "allow the ATM to go live and fully process transactions."[15]   USAG used its "confidential login information" to enter information related to the transaction into Cardtronics's customer relationship management software ("CRM").[16]   Cardtronics would charge USAG a transaction fee for each transaction conducted on the ATM.[17]

---

[11]     R. Doc. 1 ¶ 6.

[12]     *Id.*

[13]     *Id.* ¶ 7.

[14]     *Id.*

[15]     *Id.*

[16]     *Id.* ¶ 9.

[17]     *Id.* ¶ 8.

In July 2017, USAG entered into an agreement to provide electronic payment processing services to a new merchant group, LibertyX.[18]  The contract required LibertyX to use USAG as its exclusive processor.[19]  That same month, USAG began referring LibertyX's merchants to Cardtronics.[20]  USAG asserts that Cardtronics "had actual knowledge that those referrals were related to LibertyX," and that Cardtronics was or should have been aware that USAG had multiple exclusivity agreements with LibertyX.[21]  As was customary under the Agreement, for each new account that LibertyX submitted, Cardtronics would assign USAG the Keys/TIDs for the account, and USAG would enter that information in Cardtronics's system, and then activate and manage the accounts.[22]

On March 15, 2021, USAG "[s]uddenly" stopped receiving reporting from Cardtronics on all 28,484 of LibertyX's TIDs/keys.[23]  Upon realizing it no longer had access to online reporting on LibertyX's accounts, USAG contacted Cardtronics's customer-service employee, Christina Paolo, who informed plaintiff that it would have to "contact LibertyX directly."[24]  Two

---

[18]     *Id.* ¶ 11.
[19]     *Id.*
[20]     *Id.* ¶ 15.
[21]     *Id.* ¶¶ 13, 15.
[22]     *Id.* ¶¶ 15-16.
[23]     *Id.* ¶ 17.
[24]     *Id.* ¶ 18.

4

days later, on March 17, USAG received a notice from LibertyX terminating some of its processing agreements.[25]  Also on March 17, USAG discovered six new LibertyX accounts on Cardtronics's platform.[26]  USAG asserts that only Cardtronics or LibertyX could have created these new accounts.[27]

On June 6, 2021, USAG filed suit against Cardtronics.  Its complaint alleges that, in early 2021, Cardtronics and LibertyX "began conspiring to cut USAG out of the relationship and for LibertyX to process direct with Cardtronics."[28]  The complaint further alleges that this scheme "culminated with the instant porting of all 28,484 merchants from USAG's portfolio and into a direct relationship with LibertyX and Cardtronics."[29]  To carry out this scheme, USAG alleges that Cardtronics provided "LibertyX with access to all of USAG's Confidential Information specifically for the purpose of allowing LibertyX to process direct with Cardtronics or to move all of USAG's customers to a third party."[30]  Based on these allegations, plaintiff brought several causes of action against defendant, seeking to remedy the alleged injuries it sustained during its contractual relationship with Cardtronics.

---

[25]   *Id.* ¶ 17.
[26]   *Id.* ¶ 19.
[27]   *Id.*
[28]   *Id.* ¶ 20.
[29]   *Id.*
[30]   *Id.* ¶ 22.

Specifically, plaintiff alleges six claims: (1) breach of contract, (2) breach of the implied covenant of good faith and fair dealing, (3) intentional interference with prospective economic advantage, (4) unfair trade practices and unfair business practices under California's Business and Professions Code, (5) unjust enrichment, and (6) promissory fraud under California Civil Code § 3294(C)(3). Plaintiff contends that, although Louisiana law applies to its contractual claims, California law governs its non-contractual claims.[31]

Cardtronics now moves to dismiss, asserting that plaintiff's contractual claims lack sufficient factual specificity to state a claim for relief.[32] Defendant also contends that plaintiff's non-contractual claims fail because Louisiana law applies to the dispute, barring the claims brought under California law.[33] Defendant further argues that, even if California law does apply, plaintiff's claims should still be dismissed because it has not alleged conduct sufficient to state a cause of action under the applicable California provisions.[34] Alternatively, defendant moves for a more definite statement under Federal Rule of Civil Procedure 12(e).[35]

---

[31]   *Id.* ¶ 5; *see also* R. Doc. 16 at 6.
[32]   R. Doc. 15-1 at 1.
[33]   *Id.*
[34]   *Id.* at 1-2.
[35]   *Id.*

## II.   LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.  The Court must accept all well-pleaded facts as true and must draw all reasonable inferences in favor of the plaintiff.  *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 239, 244 (5th Cir. 2009).  But the Court is not bound to accept as true legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678.

On a Rule 12(b)(6) motion, the Court must limit its review to the contents of the pleadings, including attachments.  *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014).  The Court may also consider documents attached to a motion to dismiss or an opposition to that motion when the documents are referred to in the pleadings and are central to a plaintiff's claims.  *Id.*  "In addition to facts alleged in the pleadings, however, the district court 'may also consider matters of which [it] may take judicial notice.'"  *Hall v. Hodgkins*, 305 F. App'x 224, 227 (5th Cir. 2008) (citing *Lovelace v. Software Spectrum, Inc.*,

78 F.3d 1015, 1017-18 (5th Cir. 1996)).   Here, Cardtronics attaches the

relevant Agreement between the two parties to its motion to dismiss.[36]  The

Court may consider this agreement for the purposes of this motion, as it is

referenced in and essential to the complaint.  *Brand Coupon Network*, 748

F.3d at 635.


### III.   DISCUSSION
####    A.   Contractual Claims

Plaintiff contends that Cardtronics breached several provisions of the

Agreement and violated its implied covenant of good faith and fair dealing.[37]

The Court must first decide which law to apply to plaintiff's breach-of-

contract claims.

### 1. *Choice-of-Law*

The Agreement between the parties contains a choice of law provision,

which states:

> This Agreement shall be governed by the laws of the State of
> Louisiana applicable to contracts made and to be performed
> wholly within such state, without regard to principles of conflicts
> of law.   Customer [USAG] hereby irrevocably and
> unconditionally consents and submits to the in personam
> jurisdiction of any courts in Orleans Parish, State of Louisiana
> having jurisdiction over matters relating to this Agreement, and
> such courts shall be the exclusive forum for the resolution of any

---

[36]   R. Doc. 15-2.
[37]   R. Doc. 1 ¶¶ 27, 32.

and all disputes brought by Customer [USAG], unless otherwise agreed in writing.[38]

Federal courts sitting in diversity apply the choice-of-law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 498-97 (1941). Under Louisiana law, contractual choice-of-law provisions are presumed valid, unless the chosen law "contravenes the public policy" of the state whose law would otherwise apply. *See* La. Civ. Code art. 3540; *see also Barnett v. Am. Const. Hoist, Inc.*, 91 So. 3d 345, 349 (La. App. 1 Cir. 2012) ("A choice of law provision in a contract is presumed valid until it is proved invalid."). Here, both parties agree that the choice-of-law provision is valid, and that Louisiana law applies to plaintiff's contractual claims.[39]

Under Louisiana law, "[t]he essential elements of a breach of contract claim are [that] (1) the obligor[] undert[ook] . . . an obligation to perform, (2) the obligor failed to perform the obligation (the breach), and (3) the failure to perform resulted in damages to the oblige." *Favrot v. Favrot*, 68 So. 3d 1099, 1108-09 (La. App. 4 Cir. 2011).

USAG points to nine provisions in the Agreement that it asserts Cardtronics breached by suspending the agreed-upon services and giving

---

[38]   R. Doc. 15-2 § 11.6.
[39]   R. Doc. 15-1 at 9-13; R. Doc. 16 at 6.

plaintiff's confidential information to a third party, LibertyX.[40]  As a result of these breaches, USAG represents that it suffered damages, specifically that it was cut out of its processing relationships with defendant and LibertyX, and that Cardtronics effectively stole USAG's customer.[41]  In its motion to dismiss, Cardtronics does not dispute that it agreed to undertake certain obligations in the parties' Agreement.[42]  Defendant instead asserts that plaintiff's contractual claims should be dismissed because they are not supported "by a single factual allegation in the Complaint."[43]  The Court addresses each of plaintiff's alleged contract violations in turn.

### 2. *Failure to Provide Services: Sections 2.1, 2.3 & 3.3*[44]

First, plaintiff asserts that Cardtronics violated the Agreement by suspending services that it was contractually obligated to provide to plaintiff under sections 2.1, 2.3, and 3.3.  The services that defendant agreed to provide are detailed in section 2.1 of the Agreement, which states:

---

[40]   *Id.* ¶ 27.

[41]   *Id.* ¶¶ 20-21, 57.

[42]   R. Doc. 15-1 at 14.

[43]   *Id.*

[44]   Plaintiff's complaint states that defendant's failure to provide services violated "the Agreement §§ 2.1 and *3.3*."  R. Doc. 1 ¶ 27 (emphasis added).  The Court is unable to discern that obligation section 3.3 imposes on defendant.  Plaintiff's opposition to defendant's motion to dismiss clarifies that defendant "breached the Agreement by failing to provide the services agreed to under Sections 2.1 and *2.3*."  R. Doc. 16 at 8 (emphasis added).

>   **2.1** <u>**Services.**</u>   Subject to the terms and conditions of this Agreement, and provided that Customer [USAG] fulfills all of its obligations hereunder, CDS shall provide Services as requested by Customer [USAG] to drive the Terminals located at the Sites, to link such Terminals with one or more networks, to transmit Transactions initiated at such Terminals through a Network, to transmit electronic messages to such Terminals and *to provide to Customers periodic electronic reports of Transactions generated at such Terminals*.[45]

In section 2.3, defendant agreed to provide those "Services on a 24-hour per day basis, seven days a week," except for "down time" under the following circumstances: "(a) for maintenance or equipment installation, (b) facility or system modifications or upgrades, or (c) resulting from Network unavailability, power failures or other events beyond the control of CDS."[46]

Section 3.3 of the Agreement provides that "CDS shall not be required to provide Services with respect to a Terminal, until the following prerequisites were met:" (1) USAG "obtained a Sponsoring Bank providing Network access for such Terminal," (2) USAG "completed and delivered to CDS a Terminal Set-up Form and an ACH Authorization for the applicable account," and (3) CDS received "notice to Customer or commencement of Services to such Terminal, accepted such Terminal Set-up Form and ACH Authorization."[47]

---

[45]   R. Doc. 15-2 § 2.1 (emphasis added).

[46]   *Id.* § 2.3.

[47]   *Id.* § 3.3.

Plaintiff asserts that, although it fulfilled the conditions laid out in section 3.3, Cardtronics breached its duty to provide plaintiff with "periodic electronic reports"[48] of transactions, as required by sections 2.1 and 2.3. In its complaint, USAG represents that, on March 15, 2021, two days before it received LiberyX's notice of termination, it "suddenly stopped receiving reporting from Cardtronics on all of LibertyX's 28,484 ATM accounts."[49] In addition to no longer receiving reports, plaintiff also alleges that Cardtronics stopped providing it with online access to LibertyX's reports.[50] Given these factual allegations, the Court finds that plaintiff has adequately stated a breach-of-contract claim as to Cardtronics's failure to provide reporting to USAG on LibertyX's transactions, as required under sections 2.1 and 2.3 of the Agreement.

Defendant does not dispute that it stopped providing these reports to USAG, nor does it assert that plaintiff had not fulfilled its obligations under the Agreement, which might excuse its non-performance. Rather, defendant asserts the affirmative defense that its compliance with section 2.6 of the

---

[48]  R. Doc. 15-2 § 2.1. Neither party has explained how frequently "periodic" required Cardtronics to provide reports to plaintiff. At this stage of the litigation, the Court cannot conclude that Cardtronics failure to provide electronic reports on March 15, 2021 met the "periodic reporting" requirement as required by section 2.1.

[49]  R. Doc. 1 ¶ 17; R. Doc. 20 at 4.

[50]  R. Doc. 1 ¶ 17; R. Doc. 20 at 4, 8.

Agreement defeats plaintiff's breach-of-contract claim as to the failure to provide services.  Specifically, defendant contends that, under section 2.6 of the Agreement, it is permitted to "modify the Services provided," and that plaintiff's remedy for such a material change is "limit[ed] . . . to cancellation of the Contract without penalty."[51]  Section 2.6 provides that:

> **2.6 <u>Changes to Services.</u>**  CDS reserves the right to modify the Services provided during the term of this Agreement.  If any such modification constitutes a material change, Customer may cancel the modified Service, without penalty, by delivering the CDS written notice of termination within 30 days after *Customer's [USAG] receipt of updated documentation describing the changes*, such termination to be effective 30 days after receipt by CDS of timely written notice of termination from Customer.  Such termination shall not affect the parties' rights and obligations under this Agreement with respect to any other Services.[52]

Although section 2.6 permits defendant to modify the services it provides to USAG, it lacks—contrary to defendant's assertion—any language providing that USAG's remedy in such a situation is limited to cancellation of the Agreement without penalty.  Further, in order to modify the services defendant provides, section 2.6 requires it to provide USAG with "updated documentation describing the changes."  Defendant fails to address whether it met this procedural requirement by providing plaintiff with updated

---

[51]   R. Doc. 15-1 at 14.
[52]   R. Doc. 15-2 § 2.6.

documents.    To the contrary, plaintiff alleges that it never received "documentation describing the changes," and instead represents that when it "learned that it no longer had access to online reporting on the 28,484 TIDs," it contacted a Cardtronics customer-service employee," who told USAG "to contact LibertyX directly."[53]   Accordingly, because plaintiff has adequately alleged that defendant did not comply with section 2.6's requirements, it may not invoke that provision as a defense for its failure to provide the services required elsewhere in the Agreement.   *See Clark v. Amoco Production Co.*, 794 F.2d 967, 971 (5th Cir. 1986) (reversing the district court's grant of defendants' motion to dismiss based on defendants' affirmative defense where defendants had not established each element of their defense in the pleadings).

Because the Court finds that USAG has stated a plausible claim for breach of contract as to defendant's failure to provide the services required under sections 2.1 and 2.3[54] of the Agreement, the Court denies defendant's motion to dismiss as to this claim.

---

[53]    R. Doc. 1 ¶ 18.

[54]    To the extent that plaintiff alleges defendant violated section 3.3 as well, the Court dismisses this claim.  *See supra* note 44.

14

   3.  *Failure to Honor Terminal Setup Instructions and Allowing a Third-Party Access to those Systems and Reporting: Section 2.5*

Next, plaintiff contends that Cardtronics breached section 2.5 of the Agreement by failing to honor terminal setup instructions, and by allowing a third party, LibertyX, access to those systems and reports.[55]  In full, section 2.5, titled "Acceptance of Terminal Set-up Forms," states that "CDS may accept or reject any Terminal Set-up Form for any reason in its sole discretion."[56]

The Court finds that plaintiff fails to allege the elements for a breach of contract claim as to section 2.5.  Notably, it fails to properly allege that Cardtronics violated any obligation related to terminal setup instructions or third-party access that section 2.5 allegedly imposed on defendant.  There is nothing in section 2.5 that requires defendant to follow particular "terminal setup instructions," or that prohibits defendant from permitting a third party to access terminal set-up forms.  On the contrary, the provision gives defendant unfettered discretion to accept or reject terminal set-up forms.  The Court therefore dismisses plaintiff's breach-of-contract claim as to section 2.5.  *See 2002 JBO Trust No. 1 v. Royal Bank of Canada*, No. 12-

---

[55]    R. Doc. 1 ¶ 27.

[56]    R. Doc. 15-2 § 2.5.

1344, 2013 WL 871537, at *9 (E.D. La. Mar. 8, 2013) (holding that plaintiffs had not set forth a facially plausible claim for breach of contract because they failed to "provide any facts that would allow the Court to assess the obligations imposed on defendants by the contract [or] to determine whether plaintiffs have successfully pleaded facts demonstrating that defendants breached the contract terms").

### 4. *Suspending Services Without Valid Justification: Section 2.4*

Plaintiff further argues that defendant violated section 2.4 of the Agreement when it suspended services without a valid justification.[57] As previously discussed, plaintiff represents that defendant suspended the services it had agreed to provide under section 2.1 of the Agreement when it stopped providing USAG with reporting on LibertyX's 28,484 TIDs. Section 2.4 permits Cardtronics to "at any time suspend its Services with respect to any one or more of the Terminals" without liability to plaintiff, if any of the following situations occurs:

> (a) Customer has violated any Network Rule or has breached any covenant or obligation under this Agreement, (b) the Terminal has not been property maintained, is defective, does not dispense cash correctly or does not meet the requirements of any Network Rules, (c) any debit or credit initiated by CDS for Settlement, the payment of Fees or any Adjustment is rejected for any reason, (d) the Sponsoring Bank withdraws or terminates the

---

[57]    R. Doc. 1 ¶ 27.

sponsorship of Customer, (e) the Terminal is not audited on a regular basis by Customer, or (f) the Terminal is moved from the Site set forth on the applicable approval Terminal Set-up Form.[58]

In response, defendant does not assert that it stopped providing services because of a condition specified in section 2.4. Instead, defendant simply contends that "there are no factual allegations supporting [plaintiff's] claim."[59]   Plaintiff has sufficiently alleged that defendant violated the Agreement by suspending services absent a valid justification in section 2.4. The Court therefore denies defendant's motion to dismiss as to this claim.

### 5. *Refusing to Honor Cancellation of Services: Section 2.6*

Next, plaintiff alleges that Cardtronics failed to honor its "cancellation of services" after it provided "notice to Cardtronics under § 2.6."[60]   As previously discussed, section 2.6 gives Cardtronics the right to modify the services it provides to plaintiff, and that if such a modification is a material change, plaintiff is permitted to terminate the Agreement without penalty "by delivering to CDS written notice of termination within 30 days after [plaintiff's] receipt of updated documentation describing the changes."[61]

---

[58]    R. Doc. 15-2 § 2.4.
[59]    R. Doc. 15-1 at 14.
[60]    R. Doc. 1 ¶ 27.
[61]    R. Doc. 15-2 § 2.6.

Plaintiff's termination would become effective 30 days after defendant received its written notice of termination, and would "not affect the parties' rights and obligations under th[e] Agreement with respect to any other Services."[62]   But plaintiff never addresses whether it requested the cancellation of services, or whether it provided Cardtronics with written notice of its request as required by section 2.6.  Plaintiff simply states that it "notified Cardtronics about its breaches and interferences on or around March 17, 2021."[63]   Moreover, plaintiff never specifies in what ways Cardtronics refused to honor plaintiff's alleged cancellation.   Because plaintiff has not pled sufficient factual content to support an inference that defendant is liable for not honoring plaintiff's alleged termination of services under section 2.6, *see Iqbal*, 556 U.S. at 678, the Court dismisses this breach-of-contract claim.

### 6. *Terminating the Agreement Without Notice: Section 6.2*

As part of its breach-of-contract claim, plaintiff also asserts that Cardtronics terminated "portions of the Agreement" without providing USAG with the requisite notice under section 6.2.[64]   Section 6.2, titled

---

[62]   *Id.*
[63]   R. Doc. 1 ¶ 23.
[64]   *Id.* ¶ 27.

"Termination Prior to the End of Term," provides that the Agreement may

be terminated early "only" in the following situations:

> (a) Either party may terminate this Agreement immediately by written notice to the other party following the occurrence of a material breach or default by the other party . . . .

> (b) Either party may terminate this Agreement immediately, without liability, upon written notice to the other (i) if the other party (A) makes a general assignment for the benefit of creditors, (B) applies for the appointment of a trustee, liquidator or receiver for its business or property, or one is assigned involuntarily, (C) is subject to a proceeding for bankruptcy, receivership, insolvency or liquidation, or (D) is adjudicated insolvent or bankrupt[]. . . .

> (c) CDS may terminate this Agreement or curtail or restrict the provision of Services hereunder at any time or times, without liability, upon written notice to Customer following the issuance of any order, rule or regulation, the enactment of any law or decision of any court of component jurisdiction over CDS that prohibits CDS from providing the Services or restricts the provisions of such Services . . . .

> (d) Customer may terminate this Agreement with respect to the affected Services in accordance with Section 2.6 and Section 5.2 of this Agreement.[65]

The Court finds that plaintiff has not adequately alleged that defendant

violated section 6.2 by terminating "portions of the Agreement without

notice."   Section 6.2 requires Cardtronics to provide written notice to

plaintiff for early termination in certain scenarios.  But plaintiff never states

which scenario is applicable here and thereby triggered defendant's duty to

---

[65]   R. Doc. 15-2 § 6.2.

provide written notice.  Although plaintiff elsewhere in its complaint alleges that defendant materially breached the Agreement, suggesting the applicability of section 6.2(a), there is no requirement in subpart (a) that defendant provide notice.   Instead, section 6.2(a) permits plaintiff to terminate the Agreement because of defendant's material breach if *plaintiff* provides notice to defendant.  Absent plaintiff's identification of a scenario in section 6.2 that triggers defendant's obligation to provide notice to plaintiff, defendant does not have a standalone duty to provide such notice. Because USAG has failed to identify the source of defendant's obligation, it falls short of alleging the essential elements of a breach-of-contract claim. The Court thus dismisses USAG's breach of-contract-claim as to section 6.2.

### 7.  *Failing to Honor its Continuing Obligations: Section 6.3*

Plaintiff also alleges that Cardtronics failed to honor its continuing obligations in violation of section 6.3 of the Agreement.[66]  Section 6.3, titled "Continuing Obligations," states:

> Termination of expiration of this Agreement shall not relieve either party from any obligations accrued through the date of termination.  In addition, the terms and conditions set forth in this Agreement that by their terms or nature would continue beyond termination or expiration hereof (including, by way of illustration only and not in limitation, the provisions hereof

---

[66]     R. Doc. 1 ¶ 27.

> relating to confidentiality, the maintenance of Accounts and amounts therein as set forth in Section 3.5, and the payment of amounts due under Section 6.4) shall survive termination or expiration of this Agreement.[67]

Section 6.3 provides a broad range of "continuing obligations" that may be applicable following the termination of the Agreement. Plaintiff's complaint does not identify which of these broadly defined "continuing obligations" defendant breached following the termination or expiration of the Agreement. Because plaintiff has not pointed to any specific continuing obligation defendant was contractually obligated to provide, its breach-of-contract claim as to section 6.3 must be dismissed. *See 2002 JBO Trust No. 1*, 2013 WL 871537, at *10 (dismissing plaintiffs' breach-of-contract claim because of plaintiffs' failure to identify the "contractual duties owed by defendants").

> 8. *Failing to Use Ordinary Care and Failing to Correct its Errors: Section 9.1*

USAG next alleges that defendant failed to use "ordinary care," and failed to correct its errors, in violation of section 9.1 of the Agreement.[68] Under Section 9.1,

> CDS warrants that it will use ordinary care in providing the Services and will, at CDS's expense, correct any errors that are due solely to CDS personnel or the computer programs

---

[67] R. Doc. 15-2 § 6.3.
[68] R. Doc. 1 ¶ 27.

> developed and implemented by CDS.  CDS's sole liability to
> Customer for breach of this warranty shall be, without additional
> charge to Customer, to make such corrections as may be
> necessary to keep the Services in operating order in accordance
> with CDS's specification, and Customer agrees to accept the
> correction of errors by CDS as its sole and exclusive remedy.[69]

In response, defendant asserts that USAG's complaint provides no specific allegations about how it failed to exercise ordinary care, or what the applicable standard of care is.[70]

Plaintiff's complaint is notably lacking in specific facts and plausible allegations as to the ways in which defendant fell below the standard of ordinary care in providing services.  More critically, plaintiff never asserts that any alleged "errors" were "due solely to CDS personnel or the computer programs developed and implemented by CDS."  Because plaintiff has failed to plead factual allegations that would support its breach-of-contract claim under section 9.1, the Court grants defendant's motion to dismiss as to this claim.

9. *Violations of Confidentiality: Section 7.1*

Finally, USAG asserts that Cardtronics breached the Agreement's confidentiality provision by providing LibertyX with access to plaintiff's

---

[69]     R. Doc. 15-2 § 9.1.
[70]     R. Doc. 15-1 at 15.

confidential information "for the purpose of allowing LibertyX to process direct with Cardtronics or to move all of USAG's customers to a third party."[71] USAG alleges that Cardtronics shared the following "confidential information": (1) TIDs/Keys, (2) USAG's confidential login information and aggregated account information, and (3) USAG's pricing information.[72]  In response, Cardtronics contends that the Agreement's confidentiality provision does not extend to the information that plaintiff alleges defendant shared with LibertyX in violation of section 7.1.[73]

The confidentiality provision in section 7.1 defines confidential information as "a party's proprietary or confidential information designated in writing as such or that by nature of the circumstances surrounding the disclosure ought to, in good faith, be treated as proprietary or confidential, including the Services and any trade secrets contained therein."[74]  Section 7.1 further states that the confidentiality restrictions shall not apply to information that:

> (i) is or becomes publicly known through no wrongful act of the party receiving the Confidential Information; or (ii) becomes known to a party without confidential or proprietary restrictions from a source other than the disclosing party; or (iii) a party can

---

[71]   R. Doc. 1 ¶¶ 22, 27.

[72]   R. Doc. 1 ¶ 21.

[73]   R. Doc. 15-2 § 7.1.

[74]   R. Doc. 15-2 § 7.1.

show by written records [that were] in its possession prior to disclosure by the other party.[75]

USAG does not assert that any of its allegedly "confidential information" was labeled or designated in writing as confidential or proprietary. USAG also does not allege that this information should have been treated as confidential given the circumstances under which plaintiff disclosed the information to Cardtronics. Instead, plaintiff admits in its complaint that it was *Cardtronics* who provided USAG with both the TID/Keys and USAG's login information/account information.[76] As to plaintiff's allegation that defendant shared its pricing information with LibertyX, the Court notes that pricing information can be treated as confidential information. But plaintiff here fails to plausibly allege specific facts concerning defendant's access to and disclosure of any specific type of pricing information to LibertyX. Moreover, given that LibertyX is plaintiff's former customer, it would have had access to at least some of plaintiff's pricing information.

Accordingly, because plaintiff has failed to plausibly allege that its confidential information is covered by section 7.1, or that defendant shared

---

[75]   *Id.*

[76]   R. Doc. 1 ¶¶ 7, 9.

such information with LibertyX, its claim for breach of the confidentiality provision must be dismissed.

### 10.  *Breach of Implied Covenant of Good Faith and Fair Dealing*

In plaintiff's second cause of action, USAG alleges that Cardtronics willfully breached an implied covenant of good faith and fair dealing by "undercut[ting] USAG to work directly with LibertyX after USAG had expended substantial effort and financial resources to facilitate the relationship between Cardtronics, USAG, and LibertyX."[77]  USAG represents that it has shown that Cardtronics acted with a sinister motive by using USAG's proprietary information to "conspire" with USAG's customer, Liberty, to cut USAG out of the Agreement, and then refusing to inform plaintiff about its suspension of services.[78]  Defendant asserts that USAG presents only "legal conclusions," and makes no reference to fraud, ill will, or sinister motivation in pleading its second cause of action, and that therefore, its claim for breach of implied covenant of good faith and fair dealing must be dismissed.[79]

---

[77]    R. Doc. 1 ¶ 32.

[78]    R. Doc. 16 at 12.

[79]    R. Doc. 15-1 at 18.

Under Louisiana law, good faith performance is considered an "implied requirement of every contract." *Grisaffi v. Dillard Dep't Stores, Inc.*, 43 F.3d 982, 983 (5th Cir. 1995) (citing La. Civ. Code art. 1983). To state a cause of action for breach of the duty of good faith and fair dealing, plaintiff must allege that the defendant's actions were prompted by fraud, ill will, or sinister motivation. *Com. Nat'l Bank v. Audubon Meadow P'Ship*, 566 So. 2d 1136, 1139 (La. App. Ct. 1990). "Bad faith" is defined as

> [t]he opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties but by some interested or sinister motive.

*Industrias Magromer Cueros y Pieles S.A. v. La. Bayou Furs Inc.*, 293 F.3d 912, 922 (5th Cir. 2002).

Here, plaintiff alleged facts that Cardtronics purposefully refused to fulfill terms of the Agreement in order to prevent plaintiff from receiving "the fruits of the Agreement."[80] The Court finds that after drawing all reasonable inference in favor of plaintiff, these allegations amount to a plausible claim that Cardtronics's nonperformance was in bad faith, and not an honest mistake. *See, e.g.*, *Occidental Chem. Corp. v. La. Pub. Serv. Com'n*, 494 F. Supp. 2d 401, 416 (M.D. La. 2007) (finding that plaintiffs stated a cause of

---

[80]   R. Doc. 1 ¶ 32.

action for breach of the duty of good faith and fair dealing by alleging that defendants sought to deprive them "of the benefits of their bargain" when defendants "unilaterally" modified the terms of the parties' agreement). The Court thus finds that plaintiff has sufficiently stated a claim for breach of the duty of good faith and fair dealing, so as to survive defendant's motion to dismiss. Defendant's motion to dismiss is denied as to this claim.

11. *Motion for More Definite Statement*

Cardtronics also brings a motion for a more definite statement under Federal Rule of Civil Procedure 12(e) on plaintiff's breach-of-contract claims.[81] Cardtronics's Rule 12(e) motion is brought in the alternative to its Rule 12(b)(6) motion.[82] Having found that three of plaintiff's contract claims survive the 12(b)(6) inquiry, the Court denies the Rule 12(e) motion as to those claims.[83] Having granted defendant's motion to dismiss under Rule 12(b)(6) as to the remainder of plaintiff's contractual claims,[84] the Court

---

[81] R. Doc. 15-1 at 13, 17.

[82] *Id.*

[83] (1) Failure to provide the services agreed upon under the Agreement, sections 2.1, and 2.3, (2) suspension of services without valid justification, section 2.4, and (3) breach an implied covenant of good faith and fair dealing.

[84] Plaintiff's breach-of-contract claims under sections 2.5, 2.6, 3.3, 6.2, 6.3, 7.1, and 9.1.

27

finds that the Rule 12(e) motion is moot.  Accordingly, the Court denies defendant's motion under Rule 12(e).

## B.    Non-Contractual Claims

In addition to its contractual claims, USAG also brings multiple tort claims against defendant, including intentional interference with prospective economic advantage, unfair trade and business practices under the California Business and Professions Code, unjust enrichment, and promissory fraud under the California Civil Code.[85]  The Court must first determine which state's law applies to plaintiff's tort claims.

### 1. *Choice-of-Law*

Defendant seeks dismissal of plaintiff's tort claims brought under California law, on the grounds that Louisiana law, not California law, applies.

As noted, the parties' Agreement contains a choice-of-law provision which states that the "Agreement shall be governed by the laws of the State of Louisiana applicable to contracts made and to be performed wholly within such state, without regard to principles of conflicts of law."[86]  Although the parties agree that Louisiana law applies to plaintiff's breach-of-contract

---

[85]    R. Doc. 1 ¶¶ 34-57.
[86]    R. Doc. 15-2 § 11.6.

28

claims, they dispute whether the choice-of-law provision governs plaintiff's non-contractual claims. Plaintiff asserts that its non-contractual claims are governed by California law.[87] In response, defendant contends that, because all of plaintiff's claims "relate to the alleged performance or non-performance of the Contract," they are all governed by the choice-of-law provision.[88] Defendant also argues that, under Louisiana choice-of-law rules, Louisiana law controls because plaintiff has not shown that California law would be otherwise applicable, or that the application of Louisiana law would violate a public policy of California.[89]

As an initial matter, the Court must determine which jurisdiction's law governs the scope of the Agreement's choice-of-law provision. As noted by the Second Circuit Court of Appeals, "determining which jurisdiction's law governs the scope of a valid choice-of-law clause is not a simple matter." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332-33 (2d Cir. 2005). Jurisdictions are split on this matter. Some jurisdictions have concluded that the scope of a choice-of-law provision is a matter of contract interpretation subject to the law chosen by that provision. *Id.* at 333. Other jurisdictions determine a provision's scope under the same law that governs

---

[87]   R. Doc. 1 ¶ 5; R. Doc. 16 at 6.
[88]   R. Doc. 20 at 1.
[89]   R. Doc. 15-1 at 12.

the provision's enforceability, *i.e.*, the law of the forum state.  *Id.* at 332. Here, the Court need not enter this conflict.   Under either approach, Louisiana law governs the scope of the choice-of-law provision, because it is both the contractually chosen law *and* the forum state.

Under Louisiana law, choice-of-law provisions that refer narrowly to the contract govern only matters of contract interpretation and enforcement, and do not extend to tort claims.  *See, e.g.*, *Dorsey v. N. Life Ins. Co.*, No. 04-342, 2005 WL 2036738, at *6 (E.D. La. Aug. 15, 2005) ("Because the choice of law provision applies only to '[t]his Agreement,' the clause does not encompass plaintiffs' tort and statutory claims . . . ."); *Foshee v. Torch Operating Co.*, 763 So. 2d 82, 88-90 (La. App. 3 Cir. 2000) (holding that a choice-of-law clause that stated "This agreement shall be governed by and construed . . . in accordance with the law of the state of Louisiana" did not govern the determination of whether an employee was an independent contractor); *see also El Pollo Loco, S.A. de C.V. v. El Pollo Loco, Inc.*, 344 F. Supp. 2d 986, 989 (S.D. Tex. 2004) ("[The] Fifth Circuit has narrowly construed choice of law clauses so as only to apply to contract claims, and not tort claims arising out of the contractual dispute.").

Here, the parties' Agreement contains a narrow choice-of-law provision that merely says: "This "Agreement shall be governed by the laws

of the State of Louisiana applicable to contracts made and to be performed wholly within such state . . . ."[90] The provision governs only the Agreement, and does not purport to cover all disputes that may emerge between the parties.  Thus, Louisiana law dictates that the Agreement's choice-of-law clause does not apply to plaintiff's tort claims against defendant. Defendant's first argument for dismissal of plaintiff's tort claims therefore fails.[91]

Because the choice-of-law clause does not dictate choice of law as to plaintiff's tort claims, the Court must apply the choice-of-law methodology contained in Louisiana's Civil Code.  *See Klaxon*, 313 U.S. at 498-97 (holding that a federal court sitting in diversity applies the choice-of-law rules of the forum state).  Louisiana Civil Code article 3542 provides that "an issue of delictual or quasi-delictual obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue."  La. Civ. Code art. 3542.  To make this determination, courts consider "the pertinent contacts of each state to the parties and the events giving rise to the dispute, including the place of conduct and injury, the domicile, habitual residence, or place of business of the parties, and the state

---

[90]   R. Doc. 15-2 § 11.6.
[91]   R. Doc. 20 at 5.

in which the relationship, if any, between the parties was centered," as well as "the policies of deterring wrongful conduct and of repairing the consequences of injurious acts." *Id.* In addition, courts consider "the policies referred to in Article 3515," *id.*, which include "the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of the parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state." La. Civ. Code art. 3515.

"Choice-of-law decisions can be resolved at the motion to dismiss stage when factual development is not necessary to resolve the inquiry." *Energy Coal v. CITGO Petroleum Corp.*, 836 F.3d 457, 459 (5th Cir. 2016) (citing *Fortune v. Taylor Fortune Grp., LLC*, 620 F. App'x 246, 247-48 (5th Cir. 2015) (per curiam)). But, if at the motion-to-dismiss stage the Court has "been provided insufficient information to properly analyze" the conflict-of-law factors, then "it is premature [for the Court] to determine the governing law at th[at] stage." *Mack Energy Co. v. Red Stick Energy, LLC*, No. 16-1696, 2019 WL 4887410, at *9 (W.D. La. Oct. 2, 2019); *see also Floyd v. CIBC World Markets, Inc.*, 426 B.R. 622, 640-41 (S.D. Tex. 2009) (declining to decide choice of law on a motion to dismiss after finding that the parties' choice-of-law provision did not cover plaintiff's tort claims). In *Mack*

*Energy Company v. Red Stick Energy, LLC*, the court denied defendant's motion to dismiss after neither party "briefed the relationship of the alleged agreement to the forum state; . . . [or] how [the] application of one state's law over another's is compatible with the policies and needs of the interstate and international systems." 2019 WL 4887410, at *9. Similarly, in *Wright's Well Control Services, LLC v. Oceaneering International, Inc.*, this Court denied defendants' motion to dismiss plaintiff's tort claims, noting that "[a]lthough the choice of law determination is critical to their motion to dismiss, defendants have failed to demonstrate which law applies or to establish a factual foundation upon which the Court can rely to apply the relevant choice of law factors." No. 15-1720, 2015 WL 7281618, at *13 (E.D. La. Nov. 16, 2015).

As in *Mack Energy* and *Wright's Well*, neither party here has adequately briefed the Court on the parties' relationships with the candidate states *absent* the choice-of-law provision. Plaintiff alleges in its complaint that "[s]ubstantial pertinent acts . . . occurred in California and USAG suffered harm in California."[92] USAG does not elaborate on what these "pertinent acts" are, let alone address several of the other factors laid out in article 3542. Cardtronics's briefing is similarly inadequate. Its motion to

---

[92]   R. Doc. 1 ¶ 5.

dismiss focuses solely on the argument that under Louisiana Civil Code article 3540, the parties' contractual selection is binding as to plaintiff's tort claims absent a showing that the selected law contravenes the public policy of the state whose law would otherwise be applicable, and that plaintiff has not made this showing.[93]  But as noted above, the Court finds that the parties' contractual choice-of-law provision does not govern plaintiff's tort claims, and therefore, article 3540 does not apply.  And although defendant asserts that plaintiff has failed to plead a sufficient basis for California law to apply,[94] Cardtronics itself does not provide the Court with any information that would allow it to properly analyze article 3542's factors.

Notably, neither party lays out the pertinent contacts of each state to the parties nor the events giving rise to the dispute, such as the place of conduct, or the state in which the parties' relationship was centered.  Further, the parties have not addressed how the application of one law over the other would impact the needs and policies of the interstate and international system, or their own expectations.  Without such briefing, the Court is unable to address the factors under article 3542 that are necessary to the choice-of-law analysis.  Accordingly, the Court denies defendant's motion to dismiss as

---

[93]     R. Doc. 15-1 at 11.
[94]     *Id.* at 12.

to plaintiff's three causes of action that are pleaded specifically under California law: (1) intentional interference with prospective economic advantage,[95] (2) unfair trade and business practices, and (3) promissory fraud.

## 2. *Unjust Enrichment*

As for plaintiff's generally pleaded tort claim—unjust enrichment—the Court finds that both Louisiana and California recognize this cause of action and that under either state's substantive law, plaintiff has failed to state a claim upon which relief can be granted.  *See Schneider Nat. Transport v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002) ("If the laws of the states do not conflict, then no choice-of-law analysis is necessary." (quoting *W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865, 874 (5th Cir. 1990))).  Neither

---

[95] Although the complaint does not explicitly label this claim as arising under a California statute, Louisiana law does not recognize a cause of action for intentional interference with prospective economic activity. *See Petrohawk Properties, L.P. v. Chesapeake La., L.P.*, 689 F.3d 380, 394-95 (5th Cir. 2012) (noting that the Supreme Court of Louisiana has "expressly refused to adopt the broad common law doctrine of interference with a contract," and instead has recognized an "extremely limited" cause of action for intentional interference with a contract, but only as applied to "a corporate officer's duty to refrain from intentional and unjustified interference with the contractual relationship between his employer and a third person" (quoting *9 to 5 Fashions, Inc. v. Spurney*, 538 So. 2d 228, 232-34 (La. 1989))).  Moreover, plaintiff's opposition explicitly states that it brings this claim under California law.  R. Doc. 16 at 13.

Louisiana nor California law permit an unjust-enrichment claim to be pled in the alternative when the parties entered into an express contract.  *See Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1370 (2010) ("As a matter of law, an unjust enrichment claim does not lie where the parties have an enforceable express contract."); *Peterson v. AWJ Glob. Sustainable Fund, LP*, No. 15-650, 2015 WL 5921225, at *5 (N.D. Cal. Oct. 11, 2015) (noting that California law does not "provide an unjust enrichment remedy if the unjust enrichment claim arises from an actual contract"); *Wilkins v. Hogan Drilling Co.*, 471 So. 2d 863, 867 (La. App. 2 Cir. 1985) ("One cannot recover in quantum meruit where there is an agreed contract between the parties."); *Harney v. Select Portfolio Servicing, Inc.*, No. 16-1998, 2018 WL 1182407, at *10 (E.D. La. Mar. 7, 2018) (applying Louisiana law) ("Because Plaintiffs have alleged causes of action for breach of contract and in tort, Plaintiff cannot establish the fifth element [of Louisiana's unjust enrichment claim], a lack of another remedy at law.").

Here, plaintiff's unjust-enrichment claim cannot succeed under California or Louisiana law.  Plaintiff's complaint states a cause of action for, among other things, breach of contract.  Because plaintiff has alleged the existence of a contractual remedy, it is precluded from maintaining a cause

of action for unjust enrichment.  The Court grants defendant's motion to dismiss on plaintiff's unjust-enrichment claim.

## IV.  CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART defendant's motion to dismiss.  The Court DISMISSES plaintiff's breach-of-contract claims under sections 2.5, 2.6, 3.3, 6.2, 6.3, 7.1, and 9.1, with leave to amend.  The Court DISMISSES WITH PREJUDICE plaintiff's unjust-enrichment claim.  As to the remainder of plaintiff's claims, the Court DENIES defendant's motion to dismiss.  Additionally, Cardtronics's motion for a more definite statement is DENIED.  Plaintiff must file any amended complaint by **Friday, February 11, 2022.**

New Orleans, Louisiana, this __28th__ day of January, 2022.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE